## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

| | |
|---|---|
| _____ | |
| ELM TREE INVESTMENT L.P., Individually and on Behalf of All Others Similarly Situated, | : Civil Action No. 1:14-CV-61 : : <u>CLASS ACTION</u> : : |
| Plaintiff, | : COMPLAINT FOR VIOLATIONS OF : THE FEDERAL SECURITIES LAWS : |
| vs. | : : |
| OCWEN FINANCIAL CORPORATION, WILLIAM C. ERBEY, RONALD M. FARIS, JOHN V. BRITTI and BARRY N. WISH, | : : : |
| Defendants. | : <u>DEMAND FOR JURY TRIAL</u> |

## <u>COMPLAINT</u>

Plaintiff Elm Tree Investments L.P. ("plaintiff") alleges the following based upon the investigation of plaintiff's counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Ocwen Financial Corporation ("Ocwen" or the "Company"), as well as securities analysts' reports and advisories about the Company, and press releases, media reports and other public statements issued by or about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities fraud class action on behalf of all purchasers of the common stock of Ocwen between October 3, 2012 and August 11, 2014, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act") against Ocwen and certain of its senior executives for violations of the federal securities laws.

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5.   Jurisdiction is conferred by §27 of the Exchange Act, 15 U.S.C. §78aa.

3.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  The Company is headquartered both in the U.S. Virgin Islands and in Atlanta, Georgia (in a small space it first leased from Altisource Portfolio Solutions S.A. in 2010).  In 2012, Ocwen Executive Chairman and co-founder William C. Erbey ("Erbey") moved the Company's executive headquarters to a space more than twice the size of its Atlanta office in St. Croix in the U.S. Virgin Islands, where Erbey also moved his personal residence and Ocwen had opened a call center.  Ocwen's U.S. Virgin Islands headquarters are located in an economic development zone that provides tax incentives to Ocwen for 30 years, as long as it maintains its headquarters there.  The four publicly traded Ocwen spin-offs whose relationships with Ocwen also form the allegations herein are headquartered in Luxembourg, the U.S. Virgin Islands and the Grand Caymans.  As such, the nexus of the misconduct alleged herein occurred largely in this District.

4.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate telephone communications.

## THE PARTIES

5.      Plaintiff Elm Tree Investments L.P. purchased Ocwen common stock, as set forth in the accompanying certification, which is incorporated herein by reference, and has been damaged thereby.

6.      Defendant Ocwen, through its subsidiaries, is engaged in the servicing and origination of mortgage loans in the United States and internationally.  The Company's common stock is listed on the New York Stock Exchange ("NYSE"), an efficient market, under the ticker symbol "OCN."

7.      Defendant William C. Erbey ("Erbey") co-founded Ocwen and is, and was at all relevant times, Ocwen's Executive Chairman.  Previously Erbey served as the Chief Executive Officer ("CEO") of Ocwen from January 1988 to October 2010 and as the President of Ocwen from January 1988 to May 1998.  From 1983 to 1995, Erbey served as a Managing General Partner of The Oxford Group ("Oxford"), Ocwen's private investment partnership predecessor.    On November 19, 2012, defendant Erbey cashed in, selling 145,000 shares of Ocwen common stock at fraud-inflated prices for proceeds of approximately $5 million.

8.      Defendant Ronald M. Faris ("Faris") is, and was at all relevant times, Ocwen's President and CEO and a member of the Ocwen Board of Directors, serving on its Executive and Compliance Committees.

9.      Defendant John V. Britti ("Britti") served as Ocwen's Executive Vice President and Chief Financial Officer ("CFO") from March 2012 until he was appointed Executive Vice President and Chief Investment Officer in June 2014.

- 3 -

10.     Defendant Barry N. Wish ("Wish") served, at all relevant times, as a member of Ocwen's Board of Directors, its Chairman Emeritus and a member of the Board's Executive, Audit and Nominating/Governance Committees.  Defendant Wish founded Ocwen's predecessor, Oxford, in 1983 and served as its Managing General Partner from 1983 to 1995.  Defendant Wish is a co-founder of Ocwen and has served on its Board since 1988, first serving as its Chairman from 1988 to September 1996, and then as its Chairman Emeritus from September 1996.  During the Class Period, defendant Wish cashed in, selling 1.3 million shares of Ocwen common stock at fraud-inflated prices for proceeds in excess of *$57 million*:

| DATE | NO. SHARES SOLD | PRICE | PROCEEDS |
|---|---|---|---|
| November 16, 2012 | 250,000 | $34.04 | $8,510,000 |
| March 13, 2013 | 202,600 | $40.44 | $8,193,144 |
| March 14, 2013 | 297,400 | $40.72 | $12,110,128 |
| August 7, 2013 | 300,000 | $50.29 | $15,087,000 |
| November 20, 2013 | 183,674 | $53.57 | $9,839,416 |
| November 21, 2013 | 66,326 | $53.41 | $3,542,471 |
| | *1,300,000* | | *$57,282,159* |

11.     Defendants Erbey, Faris, Britti and Wish are collectively referred to herein as the "Individual Defendants."

12.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Ocwen, were privy to confidential and proprietary information concerning Ocwen, its products, operations, finances, financial condition, and present and future business prospects.   The Individual Defendants had access to non-public information about Ocwen's business, finances, products, markets and present and future business prospects via internal corporate documents, conversations and connections with

other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith.  The Individual Defendants also had access to material adverse non-public information concerning Ocwen.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

13.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Ocwen's business.

14.     As executive officers of Ocwen, the Individual Defendants controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them to the investing public.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

15.     The Individual Defendants, as executive officers and/or directors and as controlling persons of Ocwen, a publicly traded company whose common stock was governed by the federal securities laws and was registered with the NYSE, had a duty to promptly disseminate accurate and truthful information with respect to Ocwen's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Ocwen common stock would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

16.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Ocwen common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme: (i) deceived the investing public regarding Ocwen's business, operations and management and the intrinsic value of Ocwen common stock; (ii) allowed defendants Wish and Erbey to sell their personally held Ocwen common stock for proceeds in excess of $62 million; (iii) permitted Ocwen to obtain a new $2.2 billion 7-year senior secured term loan upon favorable terms; and (iv) caused plaintiff and members of the Class to purchase Ocwen common stock at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

17.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the

common stock of Ocwen during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

18.     The members of the Class are so numerous that joinder of all members is impracticable. During the Class Period, Ocwen had approximately 134 million shares of common stock outstanding, which shares were actively traded in an efficient market on the NYSE.

19.     While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Ocwen or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

20.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law complained of herein.

21.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

22.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Ocwen;

(c)     whether the price of Ocwen common stock was artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

23.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## INTRODUCTION AND BACKGROUND

24.     Defendant Ocwen is the largest non-bank mortgage servicer of subprime loans in the United States, with a massive $435 billion portfolio.  The Company has two operating segments, Servicing and Lending.  Through its Servicing segment, Ocwen

- 8 -

provides residential and commercial mortgage loan servicing, special servicing, and asset management services to owners of mortgage loans and foreclosed real estate in the United States and internationally.  It essentially acts as a third-party collection agency for banks and other entities that own mortgage portfolios, collecting payments from mortgage borrowers and handling other billing services.  The Company's Lending segment is involved in originating and purchasing conventional and government insured residential forward and reverse mortgage loans primarily through its correspondent lending arrangements.

25.     As a mortgage servicer, Ocwen is supposed to assist delinquent borrowers in reworking their loan payments when they run into trouble in order to avoid foreclosure. According to Ocwen's website, the Company "cures more loans and keeps more borrowers current than anyone in the industry," allowing it to "achieve[] pre-foreclosure resolution rates of 70% or more."  Ocwen claims it "modifies loans at rates far above industry norms," stating its "re-default rates are among the lowest."  Ocwen says it "utilizes behavioral science principles and advanced optimization analytics to drive its borrower dialogues and Net Present Value maximizing loan resolutions," a tactic it claims "increases borrower acceptance of and compliance with loan resolutions."

26.     The Company's predecessor, Oxford, was founded in 1983 by defendant Wish, who was soon joined by defendant Erbey, who together founded Ocwen and took the Company public in 1996.  By 1999, Ocwen had largely stopped making loans to people with poor credit and had focused on servicing those loans, putting the Company in a

position to reap profits in the aftermath of the 2008 housing collapse from the millions of delinquent borrowers.

27.     As regulators became critical of the rising number of foreclosures following the 2008 housing collapse and lenders' treatment of delinquent borrowers, in 2009 the Company set up the first of four related separate company spin-offs – headquartered in exotic locations like Luxembourg, the Grand Caymans and the U.S. Virgin Islands – to provide technology to and perform an array of services for Ocwen, including management of its foreclosed properties, while technically being "separate" from Ocwen.

28.     In August 2009, Ocwen spun off its Real Estate Owned and related business operations to Altisource Portfolio Solutions S.A. ("Altisource"), a publicly traded company that derives its revenues largely from providing mortgage foreclosure services to Ocwen. In 2010, Ocwen spun-off Home Loan Servicing Solutions, Ltd. ("HLSS"), a publicly traded company created to acquire mortgage servicing rights ("MSRs"), rights to fees, and other income from servicing loans from Ocwen, which hires Ocwen to collect its loan payments. In 2013, Altisource spun-off two more publicly traded companies: Altisource Residential Corporation ("Residential"), which purchases non-performing loans and foreclosed homes, many from Ocwen, to turn into rental homes; and Altisource Asset Management Corporation ("AAMC"), which serves as the asset manager for Residential's portfolio in exchange for a large quarterly incentive fee.

29.     Defendants Erbey and Wish continue to hold equity in the four affiliated publicly traded spin-offs: Altisource, AAMC, Residential and HLSS.[1]  Indeed, Erbey is the largest shareholder in each of the four spin-offs and chairs all five of the publicly traded companies.  As a result, Erbey has conflicting obligations to Ocwen and the four spin-offs, all of which continue to derive outsized revenues and earnings in large part from their ongoing, substantial business dealings with Ocwen.

30.     Unbeknownst to investors, despite defendants' public statements throughout the Class Period that the four spin-offs had sound corporate governance with separate boards and management, and that Ocwen maintained a "'strictly arms-length business relationship with' [the four spin-off] companies," in reality, due to cross-ownership and control of the five related entities which share overlapping executives, defendants Erbey and Wish were causing Ocwen to stream revenues to the four publicly traded spin-offs for services that were illicitly raising costs for the mortgagees whose loans Ocwen was supposed to be servicing, thereby exposing Ocwen to billions of dollars in regulatory and civil liability. Meanwhile, Erbey and Wish benefited personally because they owned, in large part, the four spin-offs.  For instance, the quarterly incentive fee Residential received from AAMC in the fourth quarter ("Q4") of 2013 was equal to 32% of Residential's dividends paid to shareholders, and four to seven times higher than the incentive paid to similarly situated asset managers.  Essentially, as Christopher Wyatt, a housing consultant

---

[1]     As of August 15, 2014, defendant Erbey owned or controlled more than 17.8 million shares, or approximately 13%, of the common stock of Ocwen; 5.9 million shares, or approximately 27%, of the common stock of Altisource; 862,388 shares, or approximately 1%, of the common stock of HLSS; 648,538 shares, or approximately 29%, of the common stock of AAMC; and 2,279,957 shares, or approximately 4%, of the common stock of Residential.  As of August 15, 2014, defendant Wish owned or controlled 4,153,702 shares, or 3.08%, of Ocwen; and 1,139,329 shares, or 5.12%, of Altisource.

and former Vice President at Goldman Sachs' Litton Loan Servicing LP ("Litton"), would later emphasize, Ocwen's attitude was that "'[i]f a mortgage goes into foreclosure and you lose those servicing fees, so what, [y]ou can funnel it to one of your other businesses and still make money from it.'"

31.     In February 2012, 49 states and the District of Columbia entered into a $25 billion settlement with Ally Bank (formerly GMAC), Bank of America, Citicorp, JP Morgan Chase and Wells Fargo, five of the nation's biggest mortgage lenders, over a laundry list of improprieties from "robo-signing" foreclosure documents to failing to negotiate in good faith with homeowners over inflated fees and other charges that pushed them into default (the "National Mortgage Settlement").  The National Mortgage Settlement encouraged lenders to negotiate lower rates with existing borrowers and to lower principal amounts owed in an effort to keep houses out of foreclosure.  Pursuant to new servicing rules under the National Mortgage Settlement designed to slow down foreclosures, the signing banks were prohibited from employing "robo-signing" in foreclosures or paying agents to speed up foreclosures, took on new detailed paperwork obligations, and had to take a number of other steps before foreclosing, including reviewing any loan modification proposals the borrower made and giving borrowers two weeks to accept or reject any offer the bank made.  Separately, banks also faced regulations limiting the amount of capital they could risk on servicing rights, spurring them to offload their servicing businesses.

32.     Because Ocwen was not a party to the National Mortgage Settlement or the capital rules being levied on the banks, it was a benefit to them.  Between late 2012 and early 2014, Ocwen would spend more than $1 billion exponentially expanding Ocwen's

portfolio of MSRs by snapping up assets from larger banks that were eager to offload their mortgage servicing units, as questionable foreclosure practices attracted regulatory scrutiny.  Ocwen purchased SCI Services Inc. from Morgan Stanley for $1.459 billion in October 2011; Litton from Goldman Sachs for $600 million in October 2011; Residential Capital LLC's ("ResCap") $3 billion loan-servicing unit, owned by Ally Financial Inc., in 2012; Homeward Residential Holdings, Inc. ( "Homeward" or "HRH") for $750 million in October 2012; Genworth Financial Home Equity Access Inc. ("Genworth") for $22 million in November 2012; the MSRs and servicing advances from OneWest Bank, FSB for $2.53 billion in January 2013; the MSRs of Ally Bank, a wholly-owned subsidiary of Ally Financial Inc., the indirect parent of ResCap, for $585 million in March 2013; the 51% of Correspondent One, an entity Ocwen formed with Altisource in March 2011, that it did not already own for $12.6 million in March 2013; the servicing and origination platforms of Liberty Home Equity Solutions, Inc. ("Liberty") for $22 million in April 2013; and increased its ownership of Ocwen Structured Investments, LLC ("OSI") from 26% to 87.35% for $11 million in January 2014. In the end, Ocwen more than doubled its loan servicing business during 2013 alone, and increased its portfolio by 300% over the two-year period, as bigger banks retreated from the almost $10 trillion per year business of collecting mortgage payments.  By December 2013, the Company employed approximately 10,100 professionals and staff worldwide.

33.     Ocwen and its operating subsidiaries have profited over the years from buying high-risk mortgages from banks and then extending more high interest rate loans to the already indebted homeowners.  The Company would also sometimes delay entering

payments received until the grace period had expired, charging borrowers late fees to build up large delinquency balances, and then threaten foreclosure if those delinquency balances were not paid.  The Company and its subsidiaries had been under heightened scrutiny from regulators for years because of these and other allegedly abusive practices – but the MSR offloading by large banks and other entities resulting from the National Mortgage Settlement further incentivized defendants' misconduct by making it exponentially more profitable.

34.     On December 4, 2012, *The Wall Street Journal* reported that regulatory approval of Ocwen's then-pending acquisitions of mortgage servicer HRH and a majority stake in the mortgage servicing and origination assets of ResCap from Ally might be delayed because New York Department of Financial Services ("NY DFS") Superintendent Benjamin Lawsky ("Lawsky") was demanding that Ocwen appoint a monitor to oversee the Company's mortgage servicing operations for two years.  Ocwen's mortgage banking charter is with the State of New York and thus New York wields considerable control over Ocwen.

35.     To quell its critics and allow the Company to keep growing its MRS portfolio, later in the day on December 4, 2012, Ocwen's loan servicing unit complied and entered into a consent order with the NY DFS, agreeing to appoint an independent monitor within 20 days "who [would] report directly to the Department to conduct a comprehensive review" of Ocwen's loan servicing operations in New York, representing approximately 40,000 loans (the "Consent Order").  The Consent Order stated that a June 2012 examination of Ocwen had indicated "non-compliance by Ocwen" with a previous

regulatory agreement, including the failure to send 90-day notices in "some instances" before commencing foreclosure actions, and commencing foreclosure actions without proper documentation, along with other violations.  The compliance monitor would serve for 24 months to "identify needed corrective measures to address identified weaknesses and deficiencies in Ocwen's servicing practices, make recommendations to the Superintendent, and oversee their implementation as approved by the Superintendent." Essentially, the Consent Order was supposed to subject Ocwen to rules and oversight similar to that of the big banks.

36.     The effort to quell Ocwen's critics was a success – in the short term at least. On December 5, 2012, Keefe, Bruyette & Woods stock analyst Bose George published a research note upgrading Ocwen stock to a "Buy" rating with a $40 price target, reassuring investors that "[w]e do not expect the consent order to delay the closing of either acquisition," that "while [Ocwen] is required to pay for costs associated with the monitor, we expect these costs to be moderate," and that "[a]dditionally, we do not expect this to prevent future [MSR] acquisitions."

37.     The NY DFS's monitor began its work in 2013.  However, as the market would learn at the end of the Class Period, trying to comply with the Consent Order was in fact a very expensive endeavor for Ocwen.  Moreover, New York, along with 49 other states, would reveal that Ocwen had not only continued but had intensified its abusive tactics – exposing the Company to billions of dollars in regulatory and civil liability.

38.     Meanwhile, throughout the Class Period, defendants reported period after period of record financial results and forecast strong revenue and earnings, all the while

touting Ocwen's ability to run a lean operation and cut costs, partly by outsourcing work to India and using technology to cure defaults and avoid foreclosures.  For instance, in October 2013, defendant Erbey maintained that the Company was able to maintain its margins in the face of regulatory costs through improvements in its technology.

39.     As a result of defendants' materially false and misleading Class Period statements and omissions, Ocwen shares traded at artificially inflated prices during the Class Period, reaching a Class Period high of more than $60 per share in intraday trading on October 28, 2013, more than nine times the stock's price at the beginning of 2009.

40.     While defendants were making these representations, however, Ocwen was continuing its practice of gouging borrowers while expanding its MSR portfolio.  Ocwen started to require borrowers engaged in litigation to sign non-disparagement clauses as a condition of getting their mortgages modified.  If the homeowners did not accede to the pressure and contractually bind themselves to not complain about any abusive or substandard service, they could lose their mortgage modification and end up out on the street.  Such clauses forbade consumers from saying anything negative about the Company in public forums.  Meanwhile, the Company was having difficulties integrating the huge MSR portfolios it had acquired since 2011, as it lacked the technical and professional staff required to fairly and competently respond to and address delinquent borrowers' concerns, and as a result borrowers were being foreclosed upon at alarming rates.

41.     Throughout the Class Period, in press releases, conference calls and filings with the SEC, Ocwen and the Individual Defendants issued a series of statements that were

materially false and misleading when made because defendants knew or recklessly disregarded that:

(a)    the Company was experiencing difficulties integrating the large MSR portfolios it had acquired between 2011 and early 2014 because it lacked the technical capabilities and professional staff required to fairly and competently respond to and address borrowers' delinquency issues, causing Ocwen to improperly foreclose upon certain borrowers;

(b)    due to the lack of progress in integrating the large MSR portfolios Ocwen had acquired, the Company was experiencing higher operating expenses from the complexities of running multiple mortgage servicing platforms;

(c)    Ocwen lacked sufficient controls related to document execution, resulting in robo-signing, unauthorized execution, assignment backdating, improper certification and notarization, chain of title irregularities and other related practices affecting the integrity of documents Ocwen was using in the foreclosure process;

(d)    the Company's loss mitigation and loan modification processes were deficient, causing the Company to:  (i) fail to effectively communicate with borrowers, (ii) fail to account for documents submitted by borrowers seeking loss mitigation assistance, (iii) lack reasonable expedience in addressing loss mitigation applications, (iv) provide false or misleading reasons for denial of loan modifications, and (v) fail to honor terms of loan modifications for transferred accounts;

(e)      Ocwen lacked sufficient controls related to general borrower account management resulting in misapplication of payments, inaccurate escrow accounting and statements, and assessment of unauthorized fees and charges;

(f)      Ocwen had inadequate staffing and lacked internal controls related to customer service;

(g)      Ocwen had deficiencies in control and oversight of third-party providers, including outside foreclosure counsel;

(h)      Ocwen had deficiencies in management control and supervision necessary to ensure Ocwen's compliance with applicable laws and regulations;

(i)      due to conflicting financial interests that defendant Erbey and others maintained due to their financial interests in Ocwen affiliates HLSS, Altisource, AAMC and Residential, unbeknownst to investors, Ocwen was taking actions adverse to borrowers in order to keep directing revenues to those affiliated companies, which was exposing Ocwen to billions of dollars in potential regulatory and civil liability;

(j)      Altisource in particular had been charging exorbitant fees to Ocwen to enable defendants to funnel as much as $65 million in questionable fees to Altisource;

(k)      some of the Company's financial statements issued during the Class Period did not provide a fair representation of the Company's finances and operations and were not prepared in compliance with Generally Accepted Accounting Principles ("GAAP");

(l)      Ocwen lacked adequate internal controls to ensure that its reported financial results complied with GAAP;

(m)     (a)-(l) above were reasonably likely to have a material adverse effect on Ocwen's future revenues and operating results; and

(n)     based on the foregoing, defendants lacked a reasonable basis for their positive statements about Ocwen, its then-current business and its future financial prospects.

## MATERIALLY FALSE AND MISLEADING STATEMENTS
## ISSUED DURING THE CLASS PERIOD

42.     The Class Period starts on October 3, 2012.  On that morning, before the open of trading, Ocwen issued a press release announcing that it was acquiring HRH in a deal valued at approximately $750 million.  The release stated in pertinent part as follows:

> Ocwen . . . and private equity firm WL Ross & Co. LLC entered into an agreement today whereby Ocwen will acquire Homeward Residential Holdings, Inc., including its various residential mortgage loan servicing and origination operating subsidiaries, *for approximately $588 million in cash and $162 million in Ocwen convertible preferred stock*.  Homeward services about **422,000 mortgage loans with an aggregate unpaid principal balance of over $77 billion**. Its loan origination business includes correspondent and retail lending and *is focused solely on high quality Agency-conforming mortgages*.

> *"The acquisition of Homeward significantly advances Ocwen's twin strategic growth initiatives to add high return servicing assets to its portfolio and expand origination capacity to provide for a sustainable source of future growth," said Ocwen's Executive Chairman William Erbey. "Homeward brings with it a global servicing platform as well as a growing origination business that is already operating at a $10 billion annual run-rate after launching in late 2011*."

> Homeward was organized by WL Ross & Co. in 2007 and is the result of several major platform combinations: American Home Mortgage Servicing, Option One Mortgage Company and a large servicing portfolio from Citi Residential Lending.  After normalizing for certain transition related expenses, *the acquisition of Homeward by Ocwen is expected to be immediately accretive to earnings per share*.

- 19 -

Wilbur Ross, CEO of WL Ross & Co. said, "Homeward has been profitable in each year of its existence and has also been a wonderful cash flow producer, distributing to us approximately $900 million of cash since the initial investment.  Mortgage banking is a business of scope and scale, and we believe that the combined company will fill the void created by the ongoing departures of many banks from the overall industry."

*Ron Faris, CEO of Ocwen said, "Homeward has a well-deserved reputation for excellence in the mortgage industry.  We are excited about the synergistic combination of the attractive servicing portfolio and platform, as well as the origination platform which will provide organic growth and will further Ocwen's ability to work with existing borrowers on refinancing opportunities*."

*Dave Applegate, CEO of Homeward added, "We share Ocwen's high standards and believe that our corporate culture and theirs are very compatible.  We are excited to join an enterprise with such momentum*."

43.    On this news that the Company was expanding its MSR portfolio, and thus its profits, the price of Ocwen common stock spiked, closing up over $5 per share – or 20% – at $34.88 per share on October 3, 2012, on unusually high trading volume of more than 9.7 million shares traded, or more than 4.5 times the average daily trading volume over the preceding ten trading days.

44.    On October 24, 2012, the Company issued a press release announcing that it and Walter Investment Management Corp. ("Walter Investment") had successfully bid and won ResCap's mortgage servicing and origination platform for $3 billion in a bankruptcy court-sponsored auction.  The release, which emphasized in its title that the *"Acquisition Strategically Expands Capacity in Loan Servicing for Ocwen,"* stated in pertinent part as follows:

Ocwen . . . and Walter . . . today were jointly awarded the highest and best bid for the mortgage servicing and origination platform assets of Residential Capital, LLC (ResCap) in a Bankruptcy Court sponsored auction. The bid

with a purchase price of $3 billion is subject to definitive documentation and Bankruptcy Court approval.

*ResCap, a wholly-owned subsidiary of Ally Financial Inc., was servicing at March 31, 2012 over 2.4 million loans with an aggregate unpaid principal balance (UPB) of approximately $374 billion*. Of these, approximately 68% of the loans (by UPB) are owned, insured or guaranteed by Fannie Mae, Freddie Mac or Ginnie Mae. ResCap has operations in Ft. Washington, PA, Waterloo, IA, Dallas, TX, Burbank and Costa Mesa, CA and Minneapolis, MN.

*"The acquisition of ResCap significantly advances Ocwen's planned growth initiative to add high return servicing assets to our portfolio and to expand our servicing capacity through retention of a significant portion of ResCap's high quality servicing organization," said Ocwen's Executive Chairman William Erbey*.

Under the joint bidding arrangement, Walter Investment Management Corp. will acquire the Fannie Mae mortgage servicing rights (MSR) portion of ResCap's servicing portfolio, representing approximately $50.4 billion in UPB, as well as the origination and capital markets platform.

"We are quite pleased to have won the joint bid with Ocwen to acquire these assets *on what we believe are very attractive terms*," said Mark J. O'Brien, Chairman and Chief Executive Officer of Walter Investment. "We believe our long-established relationships with Fannie Mae and history of driving strong performance from their portfolios makes us ideally suited to acquire the Fannie MSR portfolio from ResCap. Further, the opportunity to acquire the ResCap Origination platform will allow us to profitably achieve additional scale in our originations business.  We are excited by the opportunities the origination and capital markets platforms and people bring to our business.  These opportunities are indicative of the growth and acceleration of prospects in our $500 billion active pipeline."

*Ron Faris, CEO of Ocwen said, "ResCap has been an outstanding performer in the mortgage industry. We share a common philosophy of foreclosure prevention through loan modifications that are net present value positive for investors*."

Thomas Marano, CEO of ResCap added, "The scope of the financial commitment between Ocwen and Walter in ResCap's people and franchise is an indication of their joint commitment to US housing market and the current significant opportunity that exists in the US housing sector.  *The advanced technology offered by the teams at Ocwen and Walter provides an excellent opportunity for growth and continued success*."

45.     On this news of the Company again expanding its MSR portfolio, the price of Ocwen common stock spiked again, closing up more than $1.50 per share at $37.75 per share on October 24, 2012, on unusually high trading volume of more than 12.2 million shares traded, or more than 6.5 times the average daily trading volume over the preceding ten trading days.

46.     On November 1, 2012, Ocwen issued a press release announcing its third quarter ("Q3") 2012 financial results for the period ended September 30, 2012.  In addition to reporting Q3 2012 net income of $51.4 million on revenues that were "a record-setting $232.7 million, up 90% from the third quarter of 2011," and that "net income of Income from operations [was] also a record at $139.9 million for the third quarter of 2012 as compared to $56.8 million for the third quarter of 2011, an increase of 146%," the release quoted defendants Faris and Erbey as stating in pertinent part as follows:

> "With the closing of the ResCap and Homeward acquisitions, Ocwen will become the fifth largest mortgage servicer in the country.  *More importantly, the infrastructure, management and staff from these acquisitions expand and enhance our capabilities in important areas such as Ginnie Mae and master servicing.  Moreover, the Homeward origination platform will provide Ocwen with organic growth and improved ability to work with existing borrowers on refinancing opportunities . . . ,*" said Ron Faris . . . . "*Additionally, the acquisition of Liberty positions us well in a market with enormous future growth potential*."

> Mr. Faris continued, "Our record-setting results in the third quarter of 2012 show the *strong earnings power of the business currently on the books and points to our ability to generate strong results on acquired portfolios*. Modifications for the quarter came in at the midpoint of our expectations and lower than last quarter as Ocwen tested delinquent loans for HAMP 2 eligibility.  This delayed modifications in the short-run, but we expect the program to be positive longer-term.  *We are already seeing a rebound in modifications this quarter.  Our financial performance also indicates that our revenue ramp-up and delinquency performance on recently boarded portfolios continue to track well against our pro forma expectations*."

- 22 -

Chairman Bill Erbey stated, "The strong market acceptance of the HLSS follow-on offering and their recently completed term note issuance positions Ocwen well to fund expected growth at a reduced cost. HLSS, combined with our track-record of strong cash-flow from operations, will likely enable us to execute both the Homeward and ResCap transactions without issuing new equity beyond the $162 million of preferred shares used to acquire a portion of Homeward. ***We expect both transactions to provide attractive returns to our shareholders***."

47.     Following its Q3 2012 earnings announcement on November 1, 2012, the Company held a conference call with analysts and investors to discuss Ocwen's operations and business prospects. During the conference call, defendants Erbey, Faris and Britti made materially false and misleading statements about Ocwen's operations. Defendant Erbey emphasized in his opening remarks Ocwen's "consistent performance in driving down delinquencies and advances on acquired business," and that Ocwen's "consistent ability to drive financial performance on newly acquired portfolios [gave defendants] confidence that [it would] deliver strong results on recently announced acquisitions." Defendant Erbey also attributed the Company's "cost of servicing non-performing loans [being] approximately 70% lower than the industry average" to its "proprietary technology and processes [which defendants had been] develop[ing] for decades," rather than to the fact that the Company had dramatically expanded its MRS portfolio without paying the commensurate costs to adequately service the portfolio. During his opening remarks, defendant Faris highlighted a "total decline in delinquencies over the past 12 months [of] more than 5 points despite the boarding of highly delinquent loan portfolios during the period" from the acquisitions. Concerning the status of the integration of the Homeward and ResCap acquisitions in particular, defendant Faris stated in pertinent part as follows:

- 23 -

Homeward is currently generating positive income on a stand-alone basis. We expect to improve both performance and costs by transitioning to Ocwen's world-class platform but we intend to maintain substantial portions of their servicing personnel and the origination business in its entirety.

With respect to ResCap, we will take full advantage of their solid Ginnie Mae and prime loan platform. As such, we anticipate retaining much of the ResCap U.S.-based servicing personnel for the foreseeable future. I especially look forward to working together with the strong management teams at Homeward, ResCap and Liberty as we continue our positive transformation and evolution.

*For both Homeward and ResCap, we are confident that our pricing and opportunities to reduce operating expenses while improving cash flow will provide attractive returns to our shareholders*.

48.     On December 4, 2012, Ocwen entered into the Consent Order with the NY DFS pursuant to which it agreed to the appointment of an independent monitor to oversee its compliance with the servicing practices outlined in the Consent Order.

49.     On February 28, 2013, the Company issued a press release announcing its Q4 and fiscal 2012 financial results for the period ended December 31, 2012.  In addition to emphasizing that Ocwen "Significantly Increase[d] Earnings to $0.47 Per Share in the Fourth Quarter," "Revenue [Grew] 70% to Record $845 Million in 2012," and "Full Year 2012 Earnings Per Share [Rose] 85% From Prior Year" in the title of its release, the release quoted defendant Erbey as stating in pertinent part as follows:

"*Over the past 15 years, Ocwen has spent hundreds of millions of dollars in building core competitive advantages in technology and low-cost solutions. Over that time period, Ocwen has grown its servicing book of business each year by 22% or greater* with the exception of 2004 and, during the depths of the credit crisis, 2007 and 2008 when we elected not to expand. *Our longevity atop the independent servicing industry is a testament to our conservative risk posture, adaptability and laser focus on cash flow*."

- 24 -

50.     Quoting defendant Faris, the release continued in pertinent part as follows:

"With the closing of Homeward and ResCap, Ocwen's servicing portfolio will have increased by 270% to almost $470 billion, excluding master servicing . . . .  *The fifty-percent plus growth rate in revenue and earnings we have produced over the past two years should accelerate in the coming years as a result of these transactions. Moreover, we continue to build a robust pipeline of new opportunities that should result in additional growth in cash flow and earnings*."

51.     Following its Q4 and fiscal 2012 earnings announcement on February 28, 2013, the Company held a conference call with analysts and investors to discuss Ocwen's operations and business prospects.  During the conference call, defendants Erbey, Faris and Britti made materially false and misleading statements about Ocwen's operations. Discussing Ocwen's "overall market opportunity [in MSRs] of at least $1 trillion" and profitable integration of its new acquisitions, defendant Erbey stated in pertinent part as follows:

The most important component of this market opportunity is the ongoing trend of banks selling off non-core servicing assets. We believe this process is still early in its development. Most large banks and several regional banks are just beginning to develop strategies to shed non-core servicing assets. The main driver of this trend remains powerful. Banks want to reduce the regulatory burdens and costs associated with servicing highly-delinquent portfolios and refocus on their core bank franchise. Highly-delinquent loans tend to distract management's attention and harm the bank's consumer franchise.

        As an example of this trend, we continue to see new interest from banks in sub-servicing, especially for their non-performing loan portfolios. We're in discussions with several banks and would expect substantial additional business in the coming months.

        *Even after the end of consolidation for the mortgage crisis, Ocwen will have substantial earnings for several years*.  One way to think about Ocwen, is as an asset management company. A starting point for thinking of our business value, is what we can earn without adding new assets.

- 25 -

Slide 10 shows *the sustainability of our earnings over time*.  The slide shows pro forma indexed earnings across our largest transactions.  The first year is indexed at 100. *As you can see, earnings rise into years two and three, as we bring down delinquencies, collecting delinquent servicing fees and lower operating expenses*.

*In years three through five, prepayments, most of them as voluntary, begin to bring down revenue and earnings. Nevertheless, our earnings have a substantial tail, meaning that even with no new assets, Ocwen should have strong earnings and cash flow for many years*.

Discussing the status of Ocwen's profitable integration of its new acquisitions, which would keep expenses down, and the Company's purported strong customer service in handling those new MRS portfolios, defendant Faris continued in pertinent part as follows:

Our servicing integration for Homeward and ResCap is proceeding according to plan. We would expect to move all of Homeward's private label servicing to Ocwen's platform by the end of April. We are consolidating ResCap and Homeward operations in Dallas and we will be closing down Homeward's Jacksonville operation. We are maintaining ResCap locations in Iowa, Pennsylvania and California. The eventual size of these operations depends on several factors, particularly our success in acquiring new business.

In addition to our ongoing integration and transition efforts, *which will result in ongoing cost reduction throughout the remainder of the year, we continue to focus on improving quality through technology improvement and our continued rollout of basic operating principles across the organization*.

*It is important to recognize that in the business of servicing loans, quality and low cost are not in conflict, quite the opposite. It is difficult to reduce servicing cost without improving quality*. Rework is expensive and we will continue to improve upon our industry-leading position for both quality and cost.

Concerning Ocwen's compliance with the Consent Order and other regulatory concerns, defendant Faris stated in pertinent part as follows:

I'd like to spend a few minutes to update you on the regulatory front. We support the new mortgage servicing and origination rules established by the CFPB and we welcome the guidance on mortgage servicing transfers. We

continue to have productive discussions with the state regulators, state's attorneys general, and the CFPB on adopting standards similar to the national mortgage standards adopted by the big banks.

Ocwen loan servicing and other servicers have also been asked to consider a proposal to contribute to a national consumer relief fund. *In light of our leadership in assisting struggling homeowners throughout the mortgage crisis, we do not believe such a contribution is necessary, but we are continuing to discuss an appropriate overall resolution with the regulators . . . . We continue to cooperate with the New York State Department of Financial Services to ensure compliance with the servicing standards agreement we signed in 2011*.

52. On March 1, 2013, the Company filed its annual report on Form 10-K with the

SEC for fiscal 2012, signed by defendants Erbey, Faris, Britti and Wish, and certified by

defendants Faris and Britti under the Sarbanes Oxley Act of 2002 as to veracity of its

contents and the Company's effective internal controls. The Form 10-K stated in pertinent

part as follows:

For purposes of governing certain of the ongoing relationships between Ocwen and Altisource after the Separation, and to provide for an orderly transition to the status of two independent companies, we entered into certain agreements with Altisource. Under the Transition Services agreement, the companies provide to each other services in such areas as human resources, vendor management, corporate services, six sigma, quality assurance, quantitative analytics, treasury, accounting, tax matters, risk management, law, strategic planning, compliance and other areas.

. . . Under the Services Agreement . . . Altisource also provides certain technology products and support services to Ocwen . . . . In addition, under the Data Access and Services Agreement entered into in the third quarter of 2011, Ocwen has agreed to make available to Altisource certain data from Ocwen's servicing portfolio in exchange for a per asset fee.

Certain services provided by Altisource under these contracts are charged to the borrower and/or loan investor. Accordingly, such services, while derived from our loan servicing portfolio, are not reported as expenses by Ocwen. These services include residential property valuation, residential property preservation and inspection services, title services and real estate sales.

Our business is currently dependent on many of the services and products provided under these long-term contracts which are effective for up to eight years with renewal rights. *We believe the rates charged under these agreements are market rates as they are materially consistent with one or more of the following: the fees charged by Altisource to other customers for comparable services and the rates Ocwen pays to or observes from other service providers*.

53.     On May 2, 2013, Ocwen issued a press release announcing its first quarter ("Q1") 2013 financial results for the period ended March 30, 2013. In addition to emphasizing in the title that Ocwen's "Earnings Per Share Increase[d] in Excess of 100% to $0.31 Per Share" and "Revenue [Grew] 147% to Record $406.7 Million," the release quoted defendant Erbey as stating in pertinent part as follows:

"The Company's string of record quarterly revenues will continue into the second quarter as we benefit from a full quarter of ResCap revenue and our recent acquisition of Ally Bank's mortgage servicing rights . . . . Ocwen's core earnings and cash-flow were strong in the first quarter, and *we should see these trend higher as a percentage of revenue as we drive down costs and delinquencies on newly acquired business. Ocwen's lower funding costs and improving pre-pay speeds on non-prime loans should also support better performance versus our original expectations*."

. . . "*As a leader in the industry, Ocwen has a long and successful history of adding business in an accretive and disciplined manner. Ocwen remains very well-positioned with the lowest cost to service for non-performing loans in our industry and superior ability to bring down delinquencies*. The Company has a substantial pipeline, which has grown to $375 billion. With one of the strongest balance sheets in the industry, *Ocwen is well positioned to produce strong earnings, expand margins and increase cash-flow*."

The press release further quoted defendant Faris as stating in pertinent part as follows:

"*Ocwen's first quarter continued the pattern of strong financial performance and growth we have experienced over the past three years* . . . . Declining pre-payments on our legacy non-agency portfolio combined with lower interest expense on advances should strengthen our earnings picture. Our integration of both Homeward and ResCap is progressing as planned, and we completed the transition of the Homeward serviced loans to the

Ocwen platform in mid-April. Moreover, our successful acquisition of Ally's Fannie and Freddie portfolios demonstrates the value of ResCap's prime loan servicing capability to our ongoing growth."

. . . "In the first quarter of the year, Ocwen completed 24,184 modifications. We would expect quarterly modification volume to increase as our modification programs are applied to the newly acquired servicing portfolios. *We are very proud of our ability to help families avoid foreclosure by providing sensible solutions, including loan modifications, short sales and deeds-in-lieu of foreclosure. Ocwen is the industry leader in helping distressed borrowers with unique programs such as our shared appreciation modification and technology that allows us to customize offers to the specific circumstances of each borrower*."

54.     Following its Q1 2013 earnings announcement on May 2, 2013, the Company held a conference call with analysts and investors to discuss Ocwen's operations and business prospects.  During the conference call, defendants Erbey, Faris and Britti made materially false and misleading statements about Ocwen's operations.  Concerning the growth of the Company's MRS portfolio, defendant Erbey stated in pertinent part as follows:

As you've heard me say on prior calls, we believe we are still in the middle rather than near the end of a consolidation opportunity that has been brought about by the mortgage crisis. We believe the overall size of the opportunity over the next two to three years is at least $1 trillion. Banks continue to look to sell off for sub service non-core servicing assets. Several national and regional banks are developing strategies to shed non-core servicing assets to reduce regulatory burdens and cost associated with servicing delinquent portfolios and refocus on their core bank franchise. We are in discussion with these banks and we expect to communicate progress regarding these potential opportunities during the course of this year. . . .

*Beyond this robust near and medium term pipeline, an improving economy is itself a powerful potential driver of earnings and cash flow growth for Ocwen, primarily because of the significant embedded value on a non-prime portfolio*. The left hand bar on slide six shows the free cash flow we expect to generate over the next ten years with our baseline assumptions for delinquency reductions and prepayment rates assuming the economy continues to generate slow growth. *As you can see, we believe our portfolio*

- 29 -

> *can produce about $7.2 billion in net cash flow over the next ten years with zero new acquisitions* which one might describe as conservative.  It also assumes a modest return on invested capital of 5% on re-invested cash, of 5% which is about the same rate as on our term debt.  *Note that in the tenth year, operating cash flow is still over $300 million most of which is net income.  Again this is true assuming no new acquisitions*.

Concerning the status of the ongoing integration efforts, defendant Faris stated in pertinent part as follows:

> *To date, the Homeward and ResCap integrations are proceeding according to plan*.  On April 15, the last set of loans were transferred off of the Homeward servicing platform.  Most had been moved in February and March. This rapid integration of almost $80 billion of UPB onto Ocwen's platform demonstrates the unique scalability of our technology.

> It also enables us to complete in Q2 our various cost takeouts associated with this specific acquisition.  *With each large integration, we have improved the servicing transfer process, and the Homeward integration has been our best executed transfer to date.  As has been the case with our other acquisitions, we expect to see revenue on the Homeward portfolio begin to ramp up and costs to ramp down*.

> As part of our overall integration plan, Homeward and ResCap's Dallas operations are being consolidated and we are closing Homeward's operations in Jacksonville, Florida.  As previously announced, we are maintaining a presence in the former ResCap locations in Iowa, Pennsylvania and California.

> *The ResCap acquisition was in part aimed at improving Ocwen's position in prime loan servicing, and it has delivered against this promise almost immediately*.  We successfully bid for over $85 billion of Fannie Mae and Freddie Mac MSRs from Ally Bank.  $82 billion of these MSRs were closed in April, the remainder will come in over the next few months as Ally closes out its origination pipeline and sells the servicing rights to Ocwen. Both the Homeward and ResCap acquisitions have enabled Ocwen to significantly improve our GSE, Ginnie Mae, master servicing, and compliance experience and expertise.  *The overall quality, capability and scale of our servicing business is now unparalleled*.  Because the full integration of the former ResCap servicing portfolio will not begin until Q3, the anticipated ramp up in revenue and decline in costs will come more slowly than with the Homeward portfolio.

*       *       *

> *We are well positioned from a capacity and readiness standpoint to handle additional servicing some of which will simply be replacing normal run off.* Before I move on, I'd like to acknowledge the hard work and dedication through the integration process of the people that have come over to Ocwen from Liberty, Homeward, and ResCap. *We are very pleased with the quality of the people who have joined us from these entities.*

55.    On May 8, 2013, the Company filed its quarterly financial report on Form 10-Q with the SEC for Q1 2013, signed by defendant Britti, and certified by defendants Faris and Britti under the Sarbanes Oxley Act of 2002 as to veracity of its contents and the Company's effective internal controls.  In addition to repeating the Company's false and misleading financial results from the May 2, 2013 press release, the Form 10-Q stated that Ocwen "believe[d] the rates charged under [the agreements with related companies such as Altisource were] market rates as they [were] materially consistent with one or more of the following: the fees charged by Altisource to other customers for comparable services and the rates Ocwen [paid] to or observe[d] from other service providers."

56.    On August 1, 2013, Ocwen issued a press release announcing its second quarter ("Q2") 2013 financial results for the period ended June 30, 2013.  In addition to emphasizing in the title of the release that Ocwen's "Revenue [Grew] 151% to $530.0 Million," the release quoted defendant Erbey as stating in pertinent part as follows:

> "We are pleased with Ocwen's strong core earnings and cash flow *which should continue to grow with the boarding of our new acquisitions* . . . .  Ocwen's recently announced acquisition of OneWest Bank's $78 billion servicing portfolio combined with other large bank transfers *points toward continued growth as banks strategically reposition their mortgage servicing operations*.  Our current pipeline of potential new business opportunities on a probability-weighted basis exceeds $400 billion in unpaid principal balance (UPB).  *Moreover, regulatory and market trends, including greater prospects for GSE legislation and more private capital flowing into mortgage credit, provide excellent long-term prospects for Ocwen. We continue to build capacity in anticipation of further acquisitions*

*to meet our obligations to our clients, borrowers, RMBS investors and shareholders*."

. . . "We believe that higher interest rates will have little negative impact on earnings, as we have only a modest component of income related to originations, and assets and debt are match funded. Higher employment and an improving housing market, on the other hand, *should boost Ocwen's earnings.  The majority of Ocwen's earnings come from our non-prime portfolio which produces higher earnings as employment and home price improvement result in lower delinquencies*."

The press release also quoted defendant Faris as stating in pertinent part as follows:

"*We are pleased to have made progress toward a possible agreement with state and federal agencies relating to mortgage servicing practices covering Homeward, Litton and Ocwen.  We have established a reserve based on our best estimate of the net amount to be contributed by Ocwen to a consumer relief fund* . . . .  Ocwen completed 28,137 modifications in the quarter, which is an increase of 16.3% over last quarter. Since 2009, Ocwen has helped over 340,000 families stay in their homes through sensible modifications.  *We are proud to have one of the best modification results of any servicer.  Based on data from private-label securities, Ocwen consistently posts the highest rate of modifications and the lowest re-default percentage on modified non-prime loans. These results are possible because of the unique capabilities embedded in our industry leading servicing platform*."

. . . "*Ocwen's integration of the Homeward and ResCap servicing portfolios continues to meet or exceed expectations*.  The Homeward servicing portfolio transfer was completed in mid-April, and we expect that most of the transition-related expenses for Homeward have now been incurred.  The first transfer of loans from the legacy ResCap platform to Ocwen's platform was completed on time in July.  We expect to have all the non-prime loans, where most of the efficiency improvements are generated, transferred by early Fall. *The success of the Homeward integration is shown in the three percentage point drop in the 90+ delinquency rate for the Homeward portfolio during the quarter*."

57.     Following its Q2 2013 earnings announcement on August 1, 2013, the Company held a conference call with analysts and investors to discuss Ocwen's operations and business prospects.  During the conference call, defendants Erbey, Faris and Britti

made materially false and misleading statements about Ocwen's operations.  In his opening

remarks, defendant Erbey stated in pertinent part as follows:

> Let me begin by reviewing what makes Ocwen uniquely successful in the mortgage servicing space.  First, Ocwen enjoys substantive and sustainable competitive advantages within the servicing business both in terms of cost and performance.  As shown on slide four, Ocwen's cost to service non-performing loans is 70% lower than the industry average.  Moreover, the design of our systems and platform allow us to manufacture new capacity more efficiently and effectively than other servicers.  We can take people with strong empathy, language skills and intelligence and have them producing as world class home retention counselors within 90 days.

> Slide five shows the results of our ability to scale our platform. *Ocwen has a superior track record of successfully boarding large new servicing portfolios and substantially lower in delinquencies and advances.  Our ability to lower delinquency further enhances our operating cost advantage in two ways. As delinquencies fall, so do advances and interest expense on related financing.  Secondly, as delinquent loans are more expensive to service than non-delinquent loans further reducing delinquencies lowers our operating expense and improves our margins*.

> *Another unique feature of Ocwen is that we generate strong operating cash flows that exceed earnings* as shown on slide six. *This is a function both of our solid operating performance* and conservative accounting policies that tend to understate our earnings compared to other servicers.

> \*       \*       \*

> *Now let's turn to our current outlook on growth.  We believe that the improving economy and changes in the regulatory environment bode very well for Ocwen's performance and future ability to acquire assets*.  The stronger economic environment we're entering should lower delinquencies and slow prepayments as described on slide eight.

> \*       \*       \*

> *Before I talk about how we view our prospects for adding new assets, it's worth noting on slide 10 that Ocwen has a solid history over an extended period of time of adding new business*.  For over 10 years, every time Ocwen has executed a large transaction, some industry observers have speculated that it will be our last and then we will just be a melting ice cube, despite being one of the few businesses that has a predictable recurring revenue stream extending at least a decade.

So let's talk about our growth models that we've laid out on slide 11. At the end of June, our servicing portfolio was $436 billion. In addition, we've announced or expect to close on at least another $90 billion in new MSRs or sub-servicing rights in the second half of this year.

> *More importantly, we continue to see a sizeable pipeline of potential opportunities*. We currently have a pipeline of $400 billion, which is up from last quarter despite eliminating the deals we recently won. Note that the actual volume of deals we are pursuing is much larger, *our pipeline reflects a realistic assessment of what we believe will come to market and what we believe we can potentially win. Moreover, we continue to believe the overall size of the opportunity is at least $1 trillion over the next two to three years*.

*     *     *

> *As the largest servicer of non-prime assets, we see this market as the sizeable long-term opportunity for Ocwen to continue to acquire new mortgage servicing assets*.

During his opening remarks, defendant Faris stated in pertinent part as follows:

> Let me start by updating you on the progress we have made with various states and federal agencies including state attorneys general, state regulators and the CFPB. As we have previously disclosed and discussed, in February, we were requested to consider a proposal to contribute to a consumer relief fund that would provide cash payments to former borrowers who were closed upon by Homeward, Litton and Ocwen loan servicing.

> At the time, we estimated our net maximum exposure of $135 million. We were also asked to consider agreeing to the national mortgage servicing standards along with a monitoring process, which we were already partially subject to as a result of the ResCap acquisition.

> We are pleased to report that we have made significant progress towards an overall agreement. As such and in accordance with GAAP, we have recorded an expense of $52.8 million, *which we believe will be adequate after taking into account indemnifications we have from the sellers of Homeward and Litton*.

> We look forward to finalizing this process which we expect will occur very soon. As the fourth largest residential mortgage servicer in the country, *we will continue to strive to be the best we can including helping as many families as possible remain in their homes and avoid foreclosure while at the same time improving loan portfolio performance*.

Concerning the status of the ongoing profitable integration efforts, defendant Faris stated in pertinent part as follows:

> *Our integration of the Homeward and ResCap portfolios are [sic] proceeding according to plan*.  All of the remaining Homeward loans were moved to the Ocwen platform early in the second quarter and we are seeing a substantial pick up in performance, as we expect to see continued improvement in the Homeward portfolio in coming months. *We believe that most of the Homeward integration-related costs are now behind us*.

58.     On August 6, 2013, the Company filed its quarterly financial report on Form 10-Q with the SEC for Q2 2013, signed by defendant Britti, and certified by defendants Faris and Britti under the Sarbanes Oxley Act of 2002 as to veracity of its contents and the Company's effective internal controls.  In addition to repeating the Company's false and misleading financial results from the August 1, 2013 press release, the Form 10-Q stated that Ocwen "believe[d] the rates charged under [the agreements with related companies such as Altisource were] market rates as they [were] materially consistent with one or more of the following: the fees charged by Altisource to other customers for comparable services and the rates Ocwen [paid] to or observe[d] from other service providers."

59.     On September 26, 2013, the Company received a letter from the SEC concerning its Q2 2013 quarterly financial report filed on Form 10-Q.  Specifically, in its letter the SEC questioned the size of the reserve Ocwen established under the Proposed Regulators' Settlement, stating in pertinent part as follows:

> We note the Company established a reserve of $66.4 million as of June 30, 2013 under the Proposed Regulators' Settlement. Please tell us and revise future filings, to address whether there is an exposure to loss in excess of the amount accrued and what the reasonably possible loss or additional loss may be. We reference ASC 450-20-50 paragraph 3.

60.     Ocwen responded on October 10, 2013 to the SEC's September 26, 2013 inquiry, stating in pertinent part as follows:

> The Company continues to engage with the Multi-State Mortgage Committee of the Conference of State Banking Regulators, the Consumer Finance Protection Bureau and various state Attorneys General in connection with certain foreclosure related matters and is in the process of completing definitive settlement documents in connection with a proposed settlement therewith.  As a result, *the Company has assessed the likelihood of loss in excess of the amount accrued for the Proposed Regulators' Settlement as remote*.  In future filings, if the matter has not been settled and the Company determines that there is at least a reasonable possibility that an exposure to loss exists in excess of the amount accrued, it will disclose an estimate of such additional loss or range of loss or a statement that such an estimate cannot be made.

61.     The statements referenced above in ¶¶42, 44, 46-47, 49-58 and 60 were each materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them:

(a)     the Company was experiencing difficulties integrating the large MSR portfolios it had acquired between 2011 and early 2014 because it lacked the technical capabilities and professional staff required to fairly and competently respond to and address borrowers' delinquency issues, causing Ocwen to improperly foreclose upon certain borrowers;

(b)     due to the lack of progress integrating the large MSR portfolios Ocwen had acquired, the Company was experiencing higher operating expenses from the complexities of running multiple mortgage servicing platforms;

(c)     Ocwen lacked sufficient controls related to document execution, resulting in robo-signing, unauthorized execution, assignment backdating, improper

certification and notarization, chain of title irregularities and other related practices affecting the integrity of documents Ocwen was using in the foreclosure process;

(d)      the Company's loss mitigation and loan modification processes were deficient, causing the Company to (i) fail to effectively communicate with borrowers, (ii) fail to account for documents submitted by borrowers seeking loss mitigation assistance, (iii) lack reasonable expedience in addressing loss mitigation applications, (iv) provide false or misleading reasons for denial of loan modifications, and (v) fail to honor terms of loan modifications for transferred accounts;

(e)      Ocwen lacked sufficient controls related to general borrower account management resulting in misapplication of payments, inaccurate escrow accounting and statements, and assessment of unauthorized fees and charges;

(f)      Ocwen had inadequate staffing and lacked internal controls related to customer service;

(g)      Ocwen had deficiencies in control and oversight of third-party providers, including outside foreclosure counsel;

(h)      Ocwen had deficiencies in management control and supervision necessary to ensure  Ocwen's compliance with applicable laws and regulations;

(i)      due to conflicting financial interests that defendant Erbey and others maintained due to their financial interests in Ocwen affiliates HLSS, Altisource, AAMC and Residential, unbeknownst to investors, Ocwen was taking actions adverse to borrowers in order to keep directing revenues to those affiliated companies, which was exposing Ocwen to billions of dollars in potential regulatory and civil liability;

(j)      Altisource in particular had been charging exorbitant fees to Ocwen to enable defendants to funnel as much as $65 million in questionable fees to Altisource;

(k)      some of the Company's financial statements issued during the Class Period did not provide a fair representation of the Company's finances and operations and were not prepared in compliance with GAAP;

(l)      Ocwen lacked adequate internal controls to ensure that its reported financial results complied with GAAP;

(m)      that (a) - (l) above were reasonably likely to have a material adverse effect on Ocwen's future revenues and operating results; and

(n)      that, based on the foregoing, defendants lacked a reasonable basis for their positive statements about Ocwen, its then-current business and its future financial prospects.

62.      On October 31, 2013, the Company announced its Q3 2013 financial results for the period ended September 30, 2013. In addition to emphasizing in its title that Ocwen's "Revenue More Than Double[d] to $531.2 Million," the release quoted defendant Erbey in pertinent part as follows:

> "***Ocwen's revenue growth and cash-flow remain very strong with revenue from our existing portfolio trending ahead of projections***. . . . Notwithstanding our record revenues, revenues were suppressed due to delays, ***that have now been resolved***, in boarding the OneWest transaction. As expected, margins were below historical levels due to the timing involved in transitioning ResCap and OneWest. ***We have been quite cautious in our servicing transfers making certain that we have sufficient resources to support the transition of these portfolios. In the case of OneWest, we were fully-staffed well in advance of boarding the loans. We feel very comfortable that once we have completed the ResCap transition to the Ocwen technology platform, we will return to our historical margins***. Prepayment rates fell substantially in the quarter, which bodes well for future revenues. The

- 38 -

Company's current pipeline of potential new business opportunities remains at about $400 billion in unpaid principal balance (UPB). We anticipate that at least $100 billion in UPB will be awarded by sellers before the end of the year."

The press release also quoted defendant Faris as stating in pertinent part as follows:

> "***Ocwen continues to seek sensible modifications and other loan resolutions that help struggling families while providing more cash-flow to mortgage investors. We are proud to have one of the best pre-foreclosure resolution rates of any servicer***. The superiority of Ocwen's servicing was once again confirmed in a recently published report by Moody's that tracked over 1 million loans in default at the end of 2008 through mid-2013. Ocwen's overall performance ranked number one. ***These results are possible because of the unique capabilities embedded in our industry leading servicing platform***."

63.    Following its Q3 2013 earnings announcement on October 31, 2013, the Company held a conference call with analysts and investors to discuss Ocwen's operations and business prospects. During the conference call, defendants Erbey, Faris and Britti made materially false and misleading statements about Ocwen's operations. Concerning the Company's "outlook on growth," defendant Erbey maintained:

> We continue to see a sizable pipeline of potential opportunities, with a near-term pipeline of about $400 billion. We expect resolution on at least 25% of this pipeline by year-end. Note that the actual volume of deals we are pursuing is much larger. Also, note that many deals that we have won never made it into our quarterly pipeline estimate because they evolved very rapidly. Moreover, we continue to believe the overall size of the opportunity is at least $1 trillion over the next two to three years, including both large and small transitions.

> We continue to see strong indications that large and regional banks are accelerating plans to reposition their mortgage servicing portfolios, shed legacy assets and sell off or sub-service non-core servicing assets. Also as we have seen in the past, smaller subscale specialty servicers may view a sale and exit as their highest return alternative, especially given the implementation of the new servicing rules by the CFPB starting in 2014, which will likely increase fixed costs for many smaller servicers.

Concerning the Company's compliance with its legal obligations towards borrowers, defendant Faris stated in pertinent part as follows:

> Moving on to the regulatory front. Earlier this month the CFPB provided guidance to mortgage servicers for implementing new rules announced earlier this year and scheduled to take effect in 2014. As we have stated before, we support efforts by the CFPB and other state and federal regulatory agencies to support – to provide more clarity with regard to mortgage servicing and origination rules and requirements. Greater clarity reduces risk for the industry and allows us to plan appropriately for any necessary changes. ***Ocwen is well-positioned to comply with all the new requirements. In most cases we have already been following similar rules under subservicing or purchase agreements related to settlements by the large banks. More broadly, these new procedures should level the playing field across the servicing industry as smaller servicers would now need to meet the same requirements as larger servicers such as Ocwen***.

> With regard to the settlement we disclosed earlier this year, in the second quarter 2013 we established a reserve, ***which we believe covers Ocwen's exposure for a probable settlement with state and federal agencies***. At this time, we have no additional information to provide. We remain in discussions and will provide more details at the appropriate time.

During the call, defendant Erbey flagged "delays in revenues" the Company experienced during Q3 2013, stating that "OneWest when fully boarded [was supposed to] generate about $75 million in quarterly revenue," but a "portion . . . did not board [that] would have contributed about two-thirds of that amount, or $50 million." Defendant Erbey dismissed the issue however, stating that "the delays in revenues, [are] largely resolved now that most of the remaining OneWest loans we'll [sic] transfer tomorrow." Defendant Erbey also emphasized that "[o]nce ResCap and OneWest are boarded on real servicing, we expect to return to our historical margins." Continuing to discuss the status of the Company's ongoing efforts to profitably integrate its acquisitions, defendant Faris further elaborated

on the increased costs of integration, yet downplayed their significance on future earnings,

stating in pertinent part as follows:

> Moving on to our integration of recent acquisitions, as we said last quarter, our Homeward integration was complete in the second quarter and we are now focused on improving delinquencies on that portfolio. With regard to the ResCap portfolio integration, the transition to the Ocwen platform began in the third quarter with the transfer of most of the private label securities loans. Through the end of the quarter, we transitioned 22% of the ResCap portfolio. The non-agency portfolio represents about one-third of the delinquent loans which will accelerate our ability to apply Ocwen's superior loss mitigation to the loans that most need it[.] We plan to transfer the remaining loans to our platform in stages stretching into the second quarter of next year.

> *Integration costs have been somewhat higher than expected as we have been careful to assure excellent customer service and strong compliance throughout the transfer process. The ResCap integration costs are likely to continue at a high level through the end of the year and then taper in Q1 and Q2 of next year.* We also anticipate incurring a contract breakage expense when we finally exit the ResCap servicing platform of about $19 million. Nevertheless, *we expect the long-term returns on the acquisition to be better than originally modeled as revenues are trending ahead of expectations*.

> \*      \*      \*

> Over the past two years, many of our productivity gains through improvements and processes and technology have been offset by increasing regulatory burdens. Moreover, our rapid growth has not given us time to consolidate some of our gains and scale. *Once we've consolidated onto a single platform, we are confident that we can make further productivity gains and overhead cost reductions. We also believe that several technology projects that have been delayed in support of integration efforts should come online that will reduce further our already industry-leading unit cost*.

Summarizing the Company's Q3 2013 results, defendant Britti stated in pertinent part as

follows:

> To summarize some key points we've made, first, delays in closing OneWest resulted in lower revenue than we had expected, *but we are largely back on the track as of November 1*. Moreover lower pre-payments generally improved long-term revenue relative to original expectation. Second, we have work to do on the cost side, but *we have very specific action*

*plans to return to levels that we've achieved historically and we have a solid track record of delivering on costs*. Third, *we have a strong pipeline of opportunities including several near-term opportunities and longer-term growth potential in adjacent markets*.

64.     On the partial revelation of some of the integration problems the Company was experiencing, ***though defendants attempted to downplay their severity***, the price of Ocwen stock declined $5.69 per share between October 30, 2013 and November 1, 2013, closing at $53.36 per share on November 1, 2013.  However, as defendants continued to conceal the full extent of the integration problems and the Company's ongoing abusive tactics toward borrowers, and the resulting legal liability the Company faced, the price of Ocwen stock remained artificially inflated.

65.     On November 5, 2013, the Company filed its quarterly financial report on Form 10-Q with the SEC for Q3 2013, signed by defendant Britti, and certified by defendants Faris and Britti under the Sarbanes Oxley Act of 2002 as to veracity of its contents and the Company's effective internal controls.  In addition to repeating the Company's false and misleading financial results from the October 31, 2013 press release, the Form 10-Q stated that Ocwen "believe[d] the rates charged under [the agreements with related companies such as Altisource were] market rates as they [were] materially consistent with one or more of the following: the fees charged by Altisource to other customers for comparable services and the rates Ocwen [paid] to or observe[d] from other service providers."

66.     On December 19, 2013, the Consumer Financial Protection Bureau (the "CFPB"), joined by 49 states and the District of Columbia, filed a complaint in the U.S. District Court for the District of Columbia alleging that Ocwen, HRH and Litton had

violated, among other laws, the Unfair and Deceptive Acts and Practices laws of the plaintiff states and the Consumer Financial Protection Act of 2010 by deceiving consumers about their loans and engaging in illegal foreclosures.  According to the complaint, investigators found evidence that, among other things, Ocwen gave borrowers false or misleading information, did not honor trial modifications begun by previous servicers, wrongly charged fees, and denied mortgage loan modifications to eligible borrowers. During a conference call held with reporters that day, CFPB director Richard Cordray stated that "[t]oo often, trouble began as soon as the loan was transferred to Ocwen," adding that "Ocwen made troubled borrowers even more vulnerable to foreclosure."

67.    Ocwen, the CFPB, and the 49 states and District of Columbia entered into a Consent Judgment also filed in the U.S. District Court for the District of Columbia on December 19, 2013, under which Ocwen would fund a *$2.1 billion* mortgage settlement for mortgage servicing abuses (including $2 billion in first-lien principle reduction and $125 million for cash payments to borrowers whose loans had been foreclosed on).  According to the CFPB, "Ocwen took advantage of borrowers at every stage of the process."  The $2.1 billion far exceeded the $1.5 billion in revenues the Company took in during the first nine months of 2013, and dwarfed the $357 million the Company then had on its books.  Under the 2013 Consent Judgment, Ocwen was required to improve its oversight of its attorneys, bolster training for its employees, refrain from making collection calls when a borrower's application for a modification was pending, and increase its staff.  The 2013 Consent Judgment contained "Examination Findings" indicating that Ocwen suffered from:

(a)    ***Lack of controls related to document execution***, including evidence of robo-signing, unauthorized execution, assignment

- 43 -

backdating, improper certification and notarization, chain of title irregularities, and other related practices affecting the integrity of documents relied upon in the foreclosure process;

(b) *Deficiencies in loss mitigation and loan modification processes*, including but not limited to:

   (i) *Failure to effectively communicate with borrowers* regarding loss mitigation and other foreclosure avoidance alternatives;

   (ii) *Failure to account for documents submitted in tandem with application for loss mitigation assistance*;

   (iii) *Lack of reasonable expedience in approving or denying loss mitigation applications*;

   (iv) *Providing false or misleading reasons for denial of loan modifications*; and

   (v) *Failure to honor the terms loan modifications for transferred accounts and continued efforts to collect payments under the original note terms*.

(c) *Lack of controls related to general borrower account management,* including but not limited to:

   (i) Misapplication of borrower payments;

   (ii) Inaccurate escrow accounting and statements; and

   (iii) Assessment of unauthorized fees and charges.

(d) *Inadequate staffing and lack of internal controls* related to customer service;

(e) *Deficiencies in control and oversight of third-party providers*, including but not limited to, local foreclosure counsel;

(f) *Deficiencies in document maintenance processes*, including but not limited to, failure to produce documents requested in tandem with examinations; and

(g) *Deficiencies in management control and supervision necessary to ensure compliance with applicable laws and regulations*.

68.   On this news, the price of Ocwen common stock dropped more than $1 per share to close at $54.94 per share on December 19, 2013, on unusually high trading volume of more than 1.8 million shares traded.

69.     On January 22, 2014, Ocwen announced that it had agreed to purchase Wells Fargo Bank N.A.'s ("Wells Fargo") MSRs and related services advances relating to a portfolio of 184,000 loans with an unpaid principal balance of $39 billion for $2.7 billion.

70.     However, on February 6, 2014, citing the Company's potential inability to handle *any* additional loan servicing, the NY DFS indefinitely placed Ocwen's $39 billion acquisition of Wells Fargo's MSRs on hold.  As would be later reported by the *National Mortgage News* on February 10, 2014, "Ocwen ha[d] been telling analysts that it expected to acquire about $400 billion in additional servicing rights in the next 12 to 18 months," a "strategy . . . now being upended by Lawsky."

71.     On this news, the price of Ocwen common stock fell another $1.82 per share, closing at $41.38 per share on February 6, 2014, on unusually high trading volume of more than 13.4 million shares traded.

72.     On February 11, 2014, the price of Ocwen stock declined from its close of $41.85 per share the prior day to close at $38.07 per share, on unusually high trading volume of more than 8.8 million shares traded, following the publication of a *Financial Times* exposé disclosing that mortgage-backed securities investors such as PIMCO and BlackRock were considering taking legal action against Ocwen for any forced reductions in principle they suffered as a result of Ocwen's misconduct.  ***If these legal actions were successful, they would have recourse against Ocwen for the $2 billion in principle reduction they faced under the 2013 Consent Judgment***.

73.     The price of Ocwen stock fell further on unusually high trading volume of more than 3 million shares traded on Tuesday, February 18, 2014, when the Company

disclosed that it would indefinitely postpone its previously announced purchase of MSRs from Wells Fargo.  The stock closed at $36.90 per share, down nearly $1 per share from its close of $37.85 per share on Friday, February 14, 2014.  ***This hindering of the Company's ability to obtain additional market share reduced the Company's future profitability in the view of investors***.  For example, stock analyst Sterne Agee reduced its price target on Ocwen by $15 on this news.

74.     Then, on Wednesday, February 19, 2014, the price of Ocwen stock declined further when the CFPB's deputy director, Steve Antonakes, sharply criticized the entire third-party mortgage servicing industry, stating that firms were still treating consumers poorly, despite years of pressure from government officials to improve their behavior.  The CFPB was threatening to crack down on the "shell games" it charged were being played amongst servicers, "where the first servicer says the transfer ended all of its responsibility to consumers and the second servicer says it got a data dump missing critical documents." The comments were perceived by the market to be directed at Ocwen, which CFPB data demonstrated had received more consumer complaints in 2012 and 2013 than any other third-party mortgage servicer.

75.     In a February 26, 2014 letter sent to Ocwen's general counsel, Timothy Hayes, NY DFS Superintendent Lawsky charged Ocwen with misstating Ocwen's "arms-length . . . relationship" with HLSS and other affiliates and potentially harming borrowers and pushing homeowners "unduly into foreclosure," and demanded detailed information about the financial interests of Ocwen officers, directors and employees in the various affiliated companies, and documentation showing the nature and extent of business

- 46 -

relationships between Ocwen and those other firms.  The letter stated in pertinent part as follows:

> *The Department's ongoing review of Ocwen's mortgage practices has uncovered a number of potential conflicts of interest between Ocwen and other public companies with which Ocwen is closely affiliated. Indeed, the facts our review has uncovered to date cast serious doubts on recent public statements made by the company that Ocwen has a "strictly arms-length business relationship" with those companies. We are also concerned that this tangled web of conflicts could create incentives that harm borrowers and push homeowners unduly into foreclosure*. As such, we are demanding additional information on these issues as part of our review.

> Pursuant to the December 4, 2012 Consent Order between Ocwen and the Department, we have engaged an independent on-site compliance monitor at Ocwen to conduct a comprehensive review of Ocwen's servicing operations. *It is in the course of the monitorship that we uncovered these potential conflicts between and among Ocwen, Altisource Portfolio Solutions, S.A. ("Altisource Portfolio"), Altisource Residential Corporation, Altisource Asset Management Corporation, and Home Loan Servicing Solutions Ltd. (together, the "affiliated companies"), all of which are chaired by William C. Erbey, who is also the largest shareholder of each and the Executive Chairman of Ocwen*.

> As you recall, Altisource Portfolio's Chief Risk Officer was removed as a result of the Monitor's review. *During its review, the Monitor discovered that Ocwen's Chief Risk Officer also served as the Chief Risk Officer of Altisource Portfolio, and reported directly to Mr. Erbey in both capacities. This individual seemed not to appreciate the potential conflicts of interest posed by this dual role, which was particularly alarming given his role as Chief Risk Officer. He told the Monitor that Ocwen paid his entire salary, but he did not know and had apparently never asked which company paid his risk management staff*.  Indeed, it remains unclear whether Altisource Portfolio paid any compensation for the Chief Risk Officer's services. Although he has since been removed as Altisource Portfolio's Chief Risk Officer, *his and Ocwen's failure to affirmatively recognize this conflict demonstrates that the relationship between Ocwen and the affiliated companies warrants further examination*.

> Presently, Ocwen's management owns stock or stock options in the affiliated companies. *This raises the possibility that management has the opportunity and incentive to make decisions concerning Ocwen that are intended to benefit the share price of affiliated companies, resulting in harm to borrowers, mortgage investors, or Ocwen shareholders as a result*.[1]

- 47 -

[1] *The Department's review of Ocwen's mortgage servicing practices has also found that Ocwen relies extensively on affiliated companies for its information management system (from the programming of comment codes to functioning as Ocwen's IT help desk), as well as procurement of third party services. This further demonstrates the interconnected nature of Ocwen's relationship with the affiliated companies.*

76.     On this news, the price of Ocwen stock plummeted almost $3 per share to close at $36.76 per share on February 26, 2014, on extremely high trading volume of more than 12.7 million shares traded.  Beyond the concerns about independence raised by the NY DFS, analysts feared, among other things, that the Company's loan servicing business model did not offer enough compensation to provide the "level of individual attention" the new regulations would require.

77.     As reported by *Bloomberg* on February 27, 2014, "[a]s of mid-February, American homeowners had filed more than 9,000 mortgage-related complaints against Ocwen – the highest number of any non-bank servicer," citing data from the CFPB. *Bloomberg* also reported that "[i]n January [2014], the Treasury Department issued a report on the performance of servicers in the government's Home Affordable Modification Program that started in 2009," noting that "Ocwen was responsible for 79,156 loan modifications that later defaulted, the highest of any servicer," and that "Ocwen's 30 percent redefault rate was the third highest."

78.     On February 27, 2014, the Company issued a press release announcing its Q4 and fiscal 2013 financial results.  Rather than the $0.81 earnings per share ("EPS") on revenues of $562.08 million defendants had led the investment community to expect for Q4 2013 based on their bullish statements, the Company reported EPS of $0.74 – a $0.07 miss – on revenues of just $556 million.  Attributing the miss to the Company's inability to

integrate the large MRS portfolios it had gobbled up between 2011 and early 2014, the release quoted defendant Faris as stating in pertinent part that "*[c]onsolidation*" was needed to "*allow [Ocwen] to substantially lower expenses and reduce the operating complexities of running multiple platforms*."

79.     On March 3, 2014, the Company filed its annual report on Form 10-K with the SEC for fiscal 2013, signed by each of the Individual Defendants and certified by defendants Britti and Faris under the Sarbanes Oxley Act of 2002 as to the veracity of its contents and the Company's effective internal controls.  The Form 10-K stated in pertinent part as follows:

> Our business is currently dependent on many of the services and products provided under these long-term contracts which include renewal provisions.  *We believe the rates charged under these agreements are market rates as they are materially consistent with one or more of the following: the fees charged by Altisource to other customers for comparable services and the rates Ocwen pays to or observes from other service providers*.

80.     Then, on April 17, 2014, HLSS issued a press release and held a conference call to discuss its Q1 2014 financial results.  During the conference call, defendant Erbey disclosed that the NY DFS's indefinite hold on Ocwen's acquisition of MSRs was not limited to Wells Fargo – rather the NY DFS had placed on indefinite hold the transfer of all large MSR portfolios.  During the conference call, Erbey stated that "[u]ntil we resolve – this relates to Ocwen – until we resolve New York State we are not acquiring any new [MSR] portfolios at all.  As a matter of fact, the entire market quite frankly is just – nothing is really being put out for bid right now.  So the whole market has basically stopped until that gets resolved."

81.    On April 21, 2014, Ocwen received a letter from NY DFS Superintendent Lawsky, this time questioning the independence of Altisource's relationship with Ocwen and its online auction site Hubzu, which is used to auction off properties facing foreclosure.  According to Lawsky, Altisource had an eight-year agreement to manage distressed and repossessed homes in Ocwen's $435 billion servicing portfolio.  According to Lawsky, the agreement required that Ocwen properties be listed and marketed through Hubzu, even if a distressed borrower had already signed a contract for a short sale.  Defendant Erbey owns or controls approximately 27% of Altisource's stock and 13% of Ocwen's.  According to Lawsky's April 21, 2014 letter, "Hubzu appear[ed] to be charging auction fees on Ocwen-serviced properties that [were] up to three times the fees charged to non-Ocwen customers," and the higher fees "ultimately [got] passed on to the investors and struggling borrowers who [were] typically trying to mitigate their losses and [were] not involved in the selection of Hubzu as the host site."  Lawsky's letter also stated the relationship between Ocwen, Altisource and Hubzu "raise[d] significant concerns regarding self-dealing."

82.    On this news, the price of Ocwen stock again fell, almost $1 per share, closing at $38.06 per share on April 21, 2014, on unusually high trading volume of more than 2.4 million shares traded.

83.    On April 22, 2014, defendant Erbey was forced to surrender one million of the two million stock options granted to him on August 21, 2012.  The 500,000 performance-based options and 500,000 extraordinary performance-based options, which had an exercise price of $24.38, had been granted to Erbey under the Company's 2007 Equity

Incentive Plan.  The shares were surrendered in response to a shareholder's complaint that the award was inconsistent with the terms of the plan.  On May 2, 2014, *The Wall Street Journal* disclosed that the Company had received a letter on April 28, 2014 from the SEC "informing the company that it was under investigation" in connection with the stock grant.

84.     On May 1, 2014, the Company reported Q1 2014 financial results that fell well short of what defendants had led the investment community to expect, citing the mounting costs of addressing the regulatory crackdown. As reported by *The Wall Street Journal* that day, "[a]mid the scrutiny, Ocwen has ramped up spending on technology and compliance," noting that "Ocwen on Thursday said such costs helped fuel a 44% surge in overall expenses during the quarter from the same quarter a year earlier," and quoting defendant Faris as explaining during a conference call held with investors that day that "'*[t]he bar ha[d] been raised substantially because of the additional activities and documentation now required*.'"  *The Wall Street Journal* noted that, as a result, the "$551.3 million [in revenues] posted was less than the $569.4 million that analysts surveyed by Thomson Reuters expected," and Ocwen's net income of $75.8 million, or $0.54 per share, was also far less than the "$1 a share" that "[a]nalysts [had] expected."  Quoting defendant Erbey, *The Wall Street Journal* stated that "'[g]oing forward, . . . compliance [would] be among the most important factors determining long-term success in the servicing business.'"

85.     On this news, the price of Ocwen stock declined even further, closing down $2.82 per share at $35.08 per share on May 1, 2014, on extremely high trading volume of more than 11 million shares traded.

86.     On May 2, 2014, the Company filed its quarterly financial report on Form 10-Q with the SEC for Q1 2014, signed by defendant Britti, and certified by defendants Faris and Britti under the Sarbanes Oxley Act of 2002 as to veracity of its contents and the Company's effective internal controls.  In addition to repeating the Company's false and misleading financial results from the May 1, 2014 press release, the Form 10-Q stated that Ocwen "believe[d] the rates charged under [the agreements with related companies such as Altisource were] market rates as they [were] materially consistent with one or more of the following: the fees charged by Altisource to other customers for comparable services and the rates Ocwen [paid] to or observe[d] from other service providers."

87.     On July 31, 2014, Ocwen announced its financial results for Q2 2014, the period ended June 30, 2014.  Ocwen reported net income of $67 million, or $0.48 per diluted share, $0.30 lower than the market had been led to expect, blaming the decline on the rising costs of complying with regulations required by the Consent Decree.  On this news, the price of Ocwen stock plummeted approximately $4.50 per share from its close of $34.66 per share on July 30, 2014 to a close of $30.17 per share on July 31, 2014.

88.     Then on August 4, 2014, the NY DFS issued a third letter to Ocwen stating that it was reviewing what it called a "troubling transaction" with Altisource relating to the provision of force-placed insurance which was "*designed to funnel as much as $65 million in fees annually from already-distressed homeowners to Altisource for minimal work*."

- 52 -

The letter went on to question the "*role that Ocwen's Executive Chairman William C. Erbey played in approving this arrangement*," which the letter stated "*appear[ed] to be inconsistent with public statements Ocwen ha[d] made, as well as representations in company SEC filings*."  On this news, the price of Ocwen stock declined further to close at $26.98 per share on August 4, 2014, down from its close of $27.68 per share on August 1, 2014.

89.    Finally, on August 12, 2014, before the open of trading, the Company disclosed that it would be forced to restate its fiscal 2013 and Q1 2014 financial results, citing accounting improprieties and stating that its financial statements for those periods, including its statements concerning the effectiveness of its internal controls, should no longer be relied upon.  Describing its initial determination of the accounting improprieties, Ocwen stated in pertinent part as follows:

> The changes we are contemplating principally relate to the valuation methodology of our Financing Liability – MSRs Pledged in connection with certain rights to receive servicing fees, excluding ancillary income, with respect to certain mortgage servicing rights ("Rights to MSRs"), a Level 3 asset, sold to a third party, Home Loan Servicing Solutions, Ltd. ("HLSS"). At March 31, 2014, the Financing Liability - MSRs Pledged, the valuation of which is the cause of the restatement, had a reported carrying value of $634.4 million, or approximately 10% of total liabilities. We have not had any additional sales of Rights to MSRs in 2014.

> \*       \*       \*

> Following the release of our earnings for the Second Quarter of 2014, and in consultation with Deloitte & Touche LLP, we determined to adopt the changes which are driven by a re-examination of an accounting convention first adopted in 2012 with the completion of the first Rights to MSR's sale transaction to HLSS. The accounting convention applied a narrow (5%) range to valuations obtained from a third-party valuation expert in determining the carrying value of our Financial Liability – Pledged MSRs related to our sales

of Rights to MSR's. Effective as of June 30, 2014, the Company has stopped using a range.

90.     On this news the price of Ocwen stock declined further, closing down more than $1 per share on August 12, 2014 at $25.16 per share, on unusually high trading volume of more than 3.4 million shares traded.

91.     Prior to these revelations, however, defendants Wish and Erbey sold *more than $62 million worth* of Ocwen common stock at fraud-inflated prices.  Furthermore, on January 28, 2014, Ocwen issued a new $2.2 billion 7-year senior secured term loan to refinance its existing $1.3 billion senior secured term loan, and to acquire the Wells Fargo MSRs.  Based on defendants' bullish Class Period statements, Moody's Investors Service affirmed Ocwen's corporate debt ratings and stable outlook, allowing the Company to secure a favorable 4.375% yield rate on the bank loan.

92.     The market for Ocwen common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Ocwen common stock traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Ocwen common stock relying upon the integrity of the market price of Ocwen common stock and market information relating to Ocwen, and have been damaged thereby.

93.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of Ocwen common stock, by publicly issuing false and misleading statements and omitting material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Such statements and omissions were materially false and misleading because they failed to disclose material adverse

information and misrepresented the truth about the Company, its business and operations, as alleged herein.

94.     At all relevant times, the material misrepresentations and omissions particularized in this complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Ocwen's business, prospects and operations.   These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Ocwen and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.   Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## ADDITIONAL SCIENTER ALLEGATIONS

95.     As alleged herein, defendants acted with scienter in that defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company or in their own name during the Class Period were materially false and misleading.   Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws.   Defendants, by virtue of their receipt of information reflecting the true facts regarding Ocwen, their control over,

and/or receipt and/or modification of Ocwen's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

96.     Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants.

97.     The Individual Defendants, because of their positions with Ocwen, controlled the contents of the Company's public statements during the Class Period. Each Individual Defendant was provided with or had access to copies of the documents alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading. As a result, each of these defendants is responsible for the accuracy of Ocwen's corporate statements and is therefore responsible and liable for the representations contained therein.

**LOSS CAUSATION/ECONOMIC LOSS**

98.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Ocwen

common stock and operated as a fraud or deceit on Class Period purchasers of Ocwen common stock by failing to disclose and misrepresenting the adverse facts detailed herein. When defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Ocwen common stock declined significantly as the prior artificial inflation came out of the Company's stock price.

99.    As a result of their purchases of Ocwen common stock during the Class Period, plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.  Defendants' false and misleading statements had the intended effect and caused Ocwen common stock to trade at artificially inflated levels throughout the Class Period, trading above $60 per share on October 28, 2013.

100.    By concealing from investors the adverse facts detailed herein, defendants presented a misleading picture of Ocwen's business and prospects.  When the truth about the Company was revealed to the market, the price of Ocwen common stock fell significantly.  This decline removed the inflation from the price of Ocwen common stock, causing real economic loss to investors who had purchased Ocwen common stock during the Class Period.

101.    The decline in the price of Ocwen common stock after the corrective disclosures came to light were a direct result of the nature and extent of defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines in Ocwen common stock negate any inference that the losses suffered by plaintiff and the other Class members were caused by changed market

conditions, macroeconomic or industry factors or Company-specific facts unrelated to defendants' fraudulent conduct.

102.    The economic loss, *i.e.*, damages, suffered by plaintiff and the other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the price of Ocwen common stock and the subsequent significant decline in the value of Ocwen common stock when defendants' prior misrepresentations and other fraudulent conduct were revealed.

### APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

103.    At all relevant times, the market for Ocwen common stock was an efficient market for the following reasons, among others:

(a)    Ocwen common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient stock market;

(b)    as a regulated issuer, Ocwen filed periodic public reports with the SEC and the NYSE;

(c)    Ocwen regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Ocwen was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

104.    As a result of the foregoing, the market for Ocwen common stock promptly digested current information regarding Ocwen from all publicly available sources and reflected such information in the price of the stock.   Under these circumstances, all purchasers of Ocwen common stock during the Class Period suffered similar injury through their purchase of Ocwen common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

105.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint.   Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, they were not accompanied by any meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.   Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Ocwen who knew that those statements were false when made or the speaker did not have a reasonable basis to make such statements.

## COUNT I

### Violation of §10(b) of the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

106.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

107.    During the Class Period, defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

108.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

109.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Ocwen common stock. Plaintiff and the Class would not have purchased Ocwen common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

110.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Ocwen common stock during the Class Period.

## COUNT II

### Violation of §20(a) of the Exchange Act
### Against the Individual Defendants

111.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

112.    The Individual Defendants acted as controlling persons of Ocwen within the meaning of §20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of Ocwen, and their ownership of Ocwen common stock, the Individual Defendants had the power and authority to cause Ocwen to engage in the wrongful conduct complained of herein.  By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Class Counsel;

B.    Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Respectfully Submitted,
**Law Offices of Douglas L. Capdeville, P.C.**

**DATED:**  September 16, 2014          /s/Douglas L. Capdeville

**BY: DOUGLAS L. CAPDEVILLE, ESQ.**
Attorney for Plaintiff
*V.I. BAR #284*
2107 Company St. - Lot #4
P.O. Box 224191
St. Croix, USVI  00822
Tel:  (340) 773-7275
videfense@capdevillelaw.com